**UNITED STATES of America,
Plaintiff,**

v.

**Earl WOODWARD and Beulah Woodward, husband and wife,
Defendants.**

**Civ. No. 68–393.**

United States District Court,
D. Oregon.

Dec. 4, 1970.

---

Sidney I. Lezak, U. S. Atty., Joseph E. Buley, Asst. U. S. Atty., Portland, Or., for plaintiff.

Corey, Byler & Rew, Alex M. Byler, Pendleton, Or., for defendants.

## OPINION

ALFRED T. GOODWIN, District Judge:

The government took 43.29 acres of land from Earl and Beulah Woodward in Wallowa County, Oregon, for a Forest Service development road. This action, tried without a jury, is to determine the sum of money which will justly compensate the Woodwards for the taking.

The Woodwards raise cattle on two ranches. One is a winter ranch which has facilities for feeding cattle. The other ranch utilizes some 3,824.56 acres for summer pasture. The Woodwards make their year-round home on the summer ranch. Their cattle graze on the summer range from the middle of April to the first of November each year.

The Forest Service road runs the length of a canyon known as Big Creek. The summer range lies on both sides of the road. The road passes through the Woodward barnyard, and about fifty yards from the house. In the summer of 1970 a traffic count showed that some 3,000 vehicles, including log trucks, used the road. Mrs. Woodward testified that it was dusty.

Approximately two thirds of the Woodward range consists of contiguous lands lying in parts of seven sections. The remaining range consists of twenty-two contiguous forty-acre tracts strung out along Big Creek. The Forest Service road passes through them.

The Woodwards and their value witnesses took the position that the opening of a public road through their summer range and homesite has lowered the value of their entire acreage by some $60,000. The government's witnesses took the position that $2,362 would fairly compensate the Woodwards. The government figure was estimated at the rate of $50.00 per acre for 42.29 acres in the taking, plus $108.00 for an acre of meadow land near the house and $139.00 for timber removed from the right of way.

Obviously, two conflicting views of the fair cash market value of this land are polarized in this case. The experts who testified for the government looked at comparative sales of timber and grazing lands in remote, mountainous areas of northeastern Oregon. They concluded, correctly enough, that the principal market for large tracts of timbered range-lands seems to be corporate investors such as forest-products companies and large corporate ranch enterprises. Such buyers, the government witnesses said, are currently paying about $50 per acre for similar lands when and as such lands come on the market. This price is not affected by the presence or absence of public roads passing through or near such lands, the witnesses said.

The government's theory is that public roads may, in many cases, benefit the land for timber and range management purposes so as to cancel out any detriment to the land caused by enhanced access for trespassers, poachers, and vandals. In an earlier day, when "opening the West" and "subduing the land" were part of the folklore, these views went largely unquestioned.

The witnesses for the landowners, however, marshaled a growing body of evidence to support their contention that

there is now emerging another market for range and timberlands. These experts say this market attaches special value to privacy and is willing to pay for it. They point to the population pressure on public recreation lands, and observe that the wealthy and the near wealthy are beginning to look for privacy in remote areas that only a decade ago were virtually undiscovered by real-estate promoters.

One of the value witnesses testified to isolated sales of small tracts at prices far above those any purchaser would pay for land on the basis of the production potential of land. The so-called recreation market apparently is fueled by a growing number of persons willing to pay high prices for remote acreages so that they can exclude the public from sight and sound. Obviously, those persons making up this market will look elsewhere if they find a public road passing under the kitchen window of the ranch house. One need not be overly imaginative to visualize the impact of caravans of summertime log trucks and autumn hunters on land valued chiefly for the exclusiveness of its water holes and game trails.

I find that, at the time of the taking, the highest and best use of the Woodward property was for summer pasture, with a secondary potential for recreational use as a guest ranch or hunting preserve.

While the evidence gives some support to the landowners' theory of value, I do not believe that the 3,781 acres remaining in the Woodward summer range have lost $15 per acre, as testified by one of their witnesses.

I do believe, however, that the ranch has sustained a substantial loss in fair cash market value. Because of difficulties the cattle will have getting to water, and because of the harassment of cattle by excessive traffic on the road, there will be a reduction in the utilization of the grazing lands. Cattle with sore feet don't hustle for grass. There is evidence that the cattle will become footsore from running up and down the road ahead of vehicles. Then there is the obvious loss of privacy at the home site.

Based upon my view of the premises, and upon the testimonial and other evidence as a whole, I find that the value of the Woodward property was $175,000 before the taking and $160,000 after the taking.

Accordingly, the defendants are entitled to judgment in the sum of $15,000.

The foregoing opinion shall serve as findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The Clerk will prepare judgment in accordance with this opinion.